IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JONELLE GAMEZ-MORALES,                                        CV. 05-546-AS

                        Plaintiff,                                    FINDINGS AND
                                                                 RECOMMENDATION

            v.

PACIFIC NORTHWEST RENAL
SERVICES, LLC, an active Oregon
corporation, KAREN CAISSEY, and
CYNTHIA BAIN,

                        Defendants.
_____

ASHMANSKAS, Magistrate Judge:

        Defendants Pacific Northwest Renal Services, LLC ("Pacific"), and Cynthia Bain

("Bain")(collectively referred to as "Defendants"),[1] move for summary judgment on all claims

asserted against them by plaintiff Jonelle Gamez-Morales ("Plaintiff").  For the reasons set forth

---

        [1]Plaintiff also named Karen Caissey as a defendant in her defamation claim.  Caissey did
not answer the complaint or otherwise appear in this action and a default order was entered
against her on November 18, 2005.  The court later "dismisse[d] this action against defendant
Karen Caissey with prejudice to the plaintiff." Entry of Default Judgement filed January 25,
2006.

below, the court recommends granting Defendants' motion in its entirety.

Preliminary Procedural Matters

**Evidence Inconsistent with Plaintiff's Deposition**

Defendants move to strike portions of Plaintiffs' declaration arguing that the testimony is inconsistent with her prior sworn testimony.  The Ninth Circuit has held that an issue of fact cannot be created by an affidavit that contradicts prior deposition testimony.  Foster v. Arcata Assoc., Inc., 772 F.2d 1453, 1462 (9th Cir. 1985), cert. denied, 475 U.S. 1048 (1986); Radobenko v. Automated Equipment Corp., 520 F.2d 540, 543-44 (9th Cir. 1975).   Kennedy v. Allied Mutual Ins. Co., 952 F.2d 262, 266-67 (9th Cir. 1991), subsequently limited that holding, explaining that:

> "the Foster-Radobenko rule does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony.  Rather, the Radobenko court was concerned with 'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment.  Therefore, before applying the Radobenko sanction, the district court must make a factual determination that the contradiction was actually a 'sham'."

- Paragraph 10 of Plaintiff's Declaration

The first evidentiary issue arises with regard to Plaintiff's deposition testimony that she did not suffer any anxiety before she went on medical leave in late March 2004.  In her declaration, Plaintiff indicates that in 2003, she "experienced feelings that she later learned were panic attacks."  A careful reading of Plaintiff's deposition reveals she testified that she felt anxious in late 2003 and early 2004 but that she wasn't diagnosed with panic disorder without agoraphobia until after April 2004.  Plaintiff's declaration does not truly contradict her deposition testimony in this regard.

- Paragraph 39 of Plaintiff's Declaration

In Paragraph 39, Plaintiff describes in detail the anxiety symptoms she felt in November 2003 after a confrontation with a co-worker which included:

fear for my life, sleeplessness, not being able to eat regularly, and difficulty drinking liquids. I started to see things that were not there while I was walking, such as seeing stairs, seeing people, seeing things coming at me. When I was at the Rose Quarter Facility, sometimes I had trouble trusting that I had done everything correctly in the treatment of the patients and I would check my work several times. I was starting to lose my ability to concentrate on the task that I was performing.

In her deposition, Plaintiff described herself as "having a lot of anxiety" immediately after the confrontation and that her anxiety affected her self-control as well as her ability to trust and concentrate. Pltf's. Depo. at 117, 121, 145. The declaration, while stating her symptoms in much more detail, does not directly contradict the deposition testimony that she was anxious, and unable to maintain control, trust or concentrate.

- Paragraph 30 of Plaintiff's Declaration

Plaintiff testified at her deposition that she was aware of Pacific's policy that employee's purses and backpack were not allowed in the patient care area and that she put her purse on the counter in the patient-care area. In her declaration, Plaintiff reported that she did not believe she violated the policy by placing her purse on the counter. This statement reveals Plaintiff's interpretation of the policy but does not contradict her deposition testimony.

- Paragraph 47 of Plaintiff's Declaration

In Paragraph 47 of her declaration, Plaintiff denies making the statements "I'm not going to do that. I don't care if I written up for insubordination." In her deposition, she admitted to saying "I wasn't going to do that. It wasn't my job task. I had already done my job task." Pltf's. Depo. at 137-38. Plaintiff never admitted that she expressed no concern that she might get written up for insubordination. Accordingly, the testimony is not contradictory on this issue. The court should strike the declaration statement that Plaintiff never said she wasn't going to perform the requested job task as clearly contradictory to her deposition testimony and a sham.

- Paragraphs 55-64, 66, 67 and 69 of Plaintiff's Declaration[2]

These paragraphs describe the extent to which Plaintiff's alleged disability affected her daily activities after she began her medical leave. In her deposition, Plaintiff testified that, as of July 2004, she was unable to leave her house as often as she used to, she exercised less and her church attendance dropped from twice a week to once a week or less. She applied for new jobs mostly by computer, she was fearful when she drove and she avoided driving to the Safeway store, her mailbox and the general area around the Rose Quarter facility. However, she does still enjoy going to the Lloyd Center. Plaintiff testified that she used the telephone less and she had trouble concentrating and remembering how to make things that she had made before. It is clear from her deposition testimony that, while her activities are somewhat limited as a result of her panic disorder, Plaintiff is still able to engage in virtually all activities she engaged in prior to her diagnosis.

Plaintiff's description of her limitations in her declaration are much more dramatic. Plaintiff states that, after she went on medical leave, she remained in her house and was unable to go out the front door, except to attend to her medical condition. She stopped answering the phone, taking care of herself, driving, attending church and exercising. Plaintiff reported that she started driving in April 2005 when she returned to working, but only if there was no public transportation or friend available to transport her. She started attending church once a month at the direction of her therapist but she is still unable to exercise at all.

The court finds that Plaintiff's declaration contradicts her deposition testimony with regard to the extent to which her panic disorder affects her daily activities. The type of activity that is

---

[2]Defendants list only exhibits 39, 55-58, 60-64 and 69 in the title of this section but discuss all of the paragraphs listed here in the discussion. The court finds that all of these paragraphs should be treated similarly.

limited is consistent.  It is just the degree of limitation that differs.  It appears that Plaintiff embellished her limitations in her declaration to aid in the defense of Defendants' motion for summary judgment.  The court finds that Plaintiff's declaration testimony, to the extent it expands on the limitations described by her under oath at her deposition, should be stricken.

**Lack of Foundation/Personal Knowledge**

Defendants assert that Plaintiff lacks foundation and personal knowledge with regard to a number of statements set forth in her declaration.  In Paragraph 24, Plaintiff discusses the reasons Angela Uba was discharged by Defendant.  In Paragraphs 40 and 44, Plaintiff offers her understanding of the purpose of Medicare representatives visits to Defendant's Lloyd Center facility. Plaintiff discusses, in Paragraphs 68, 69 and 70, the treatment of her panic disorder and the symptoms she continues to experience.[3]

- Paragraph 24

The court agrees that Plaintiff lacks personal knowledge with regard to the reasons for Uba's termination.  In her deposition, and later in her declaration, Plaintiff stated that she did not know that Uba had been terminated.  When Plaintiff inquired about Uba's status, she was told it was confidential information.  This paragraph should be stricken.

- Paragraph 40 and 44

Plaintiff's statements regarding her understanding or belief about the reason for the Medicare visits is not evidence of the actual reasons for the visits.  Her statements only prove her state of mind at the time, of which she has sufficient personal knowledge.

---

[3]Defendants include Paragraph 78 in the title of this section but do not discuss it in the argument section.  The content of Paragraph 78 addresses Plaintiff's understanding of Loughney's criticism that she second-guessed other people's work.

- Paragraphs 68, 69 and 70

In these paragraphs, Plaintiff discusses how she is dealing with the continuing symptoms of her disability. She was prescribed Xanax, which she took when she could afford it. It helps but does not get rid of her symptoms. She calls Dr. Kaiser for help when she is having an anxiety attack. Dr. Kaiser reminds her of the exercises she can use to focus. She has incorporated activities back into her life with the help of therapy. She understands that her diagnosis is long term. Plaintiff has sufficient personal knowledge of all of these statements to offer them into evidence.

**Hearsay**

Defendants object to the statements contained in Paragraphs 36, 42, 72 and 73 of Plaintiff's declaration as hearsay. Hearsay is defined as an out of court statement offered in evidence to prove the truth of the matter asserted. Federal Rule of Evidence 801. Hearsay is admissible only if it qualifies as an exception to the general hearsay rule.

- Paragraph 36 and 42

Paragraphs 36 and 42 refer to statements made to Plaintiff which caused her to react in a certain way. In other words, Plaintiff is not offering the statements for the truth of the matter contained therein but to show why she responded to the statement the way she did. These statements are not hearsay and the paragraphs should be allowed.

- Paragraph 72 and 73

Paragraphs 72 and 73 provide that Plaintiff was told by Anna Harris and Karen Caissey that Cindy Bain[4] was telling others, including Caissey, that Plaintiff was fired by Pacific for using drugs.

---

[4]Anna Harris told Plaintiff that Karen Caissey was also making the defamatory statement. Plaintiff has obtained a default order dismissing Caissey from this action so the court will not address the defamatory statements allegedly made by Caissey.

Harris does not remember being told or otherwise hearing that Bain had made the defamatory statement.

Here, Plaintiff is clearly not offering the statement that she was fired for drug use to prove the truth of that statement, so the underlying statement by Bain is not hearsay. The comments by Harris and Caissey that Bain said that Plaintiff was fired for drug use are offered to prove that Bain made the defamatory statements and are hearsay. See Hickey v. Settlemier, 318 Or. 196, 205 (1993)(statement made by a reporter on videotape that "[Defendant] says there's no doubt in her mind that [plaintiff] is mistreating animals and dealing in stolen pets" is inadmissible hearsay.)

Plaintiff argues that these secondary statements are an admission by the agent of a defendant and qualify as an exception to the hearsay rule. Bain is the only remaining defendant named in the defamation claim. The court finds that neither Harris or Caissey were acting as Bain's agent at any time and that this exception does not apply. Plaintiff also asserts that the statement qualifies as a "present sense impression" under FRE 803(1) because Harris repeated the statement immediately to Plaintiff after hearing it. Unfortunately for Plaintiff, the record is void of any evidence regarding the timing of Harris's hearing the defamatory statement and her sharing that statement with Plaintiff. Finally, Plaintiff asks the court to apply the residual exception. The court does not find that the statement "has equivalent circumstantial guarantees of trustworthiness" in light of the fact that Plaintiff's statement is the only evidence of the defamatory statement and Harris denies that she ever heard the statement.

Paragraph 72 and 73 of Plaintiff's declaration are hearsay statements to which no exception applies. These paragraphs should be stricken.

**Violation of Rule 30(e)**

Exhibit HHH to the affidavit of Sara Thistlethwaite is the correction sheet to Plaintiff's deposition transcript which she signed on January 20, 2006. Defendant's move to strike this exhibit arguing that it violates Rule 30(e) of the Federal Rules of Civil Procedure.

Rule 30(e) provides that:

> If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them. The officer shall indicate in the certificate prescribed in subdivision (f)(1) whether any review was requested and, if so, shall append any changes made by the deponent during the periods allowed.

Plaintiff's counsel represents in her affidavit she asked that Plaintiff be allowed to read and sign the deposition transcript at the end of the deposition and after defense counsel left. Thistlethwaite Aff. at 2. The court reporter confirmed this stating that: "[a]fter the deposition ended, Ms. Bernick and Ms. Osterlink left the premises. As I was leaving the premises, Ms. Thistlethwaite requested her client read and sign the transcript." Montero Aff. at 1. This evidence clearly establishes that Plaintiff failed to request review before the completion of the deposition as required by Rule 30(e). Additionally, the court reporter did not indicate in her certificate that Plaintiff requested such review.

Exhibit HHH was not prepared in accordance the Federal Rules of Civil Procedure. Defendants' motion to strike the exhibit should be granted and this court has not considered the contents of the exhibit in ruling on Defendants' motion for summary judgment.

/ / / / /

**Failure to Produce Documents to Defense Counsel**

Exhibits D, E and F to the affidavit of Sara Thistlethwaite are transcripts of the testimony of Christine Asenberg, Chastity McCarthy-Calapuno and Laurie Buhay at Plaintiff's workers'

compensation hearing.   Exhibit JJJ to the same affidavit is a portion of Dr. Kaiser's deposition transcript taken with regard to the workers' compensation hearing.   Exhibit 5 to Plaintiff's declaration is the denial of Plaintiff's claim for work-related stress by Cambridge Integrated Services Group, Inc.  Defendants assert that these exhibits should be stricken because they were not provided to defense counsel in response to their request for production.  The court has reviewed each of these exhibits and finds that they do not offer any relevant evidence not contained in other admissible evidence. So, while the court has considered this evidence, such evidence was not novel and was not outcome determinative. Accordingly, Defendant's motion to strike exhibits D, E, F and JJJ and Exhibit 5 should be denied.

**Improper Authentication of Documents**

Defendants move to strike Exhibits G, J, N, O, R, S, U, V, W, Y, Z, AA, CC, DD,  FF, GG, HH, JJ, LL, MM, SS, UU, WW, XX, BBB, CCC, and GGG to the affidavit of Sara Thistlethwaite on the ground that Plaintiff's counsel lacks the personal knowledge of the documents to proper authenticate them and offer them into evidence.  Again, the court has reviewed each of these exhibits and finds that they do not offer any unique, relevant evidence not already properly before the court. As with the exhibits discussed above, the court has considered them with regard to Defendants' summary judgment motion, the exhibits were not outcome determinative and Defendants' motion to strike these exhibits should be denied.

Defendants also move to strike Exhibit Q for improper authentication. Exhibit Q is a letter written and signed by Loughney.  This letter was also offered by Plaintiff as an exhibit to Glaccum's deposition (Exhibit 21) with no objection by Defendant.  As the exhibit is already properly before the court, Defendants motion to strike Exhibit Q should be denied.

**Improper Objections to Defendants' Concise Statement of Material Facts**

Defendants object to a few of the paragraphs contained in Plaintiff's Response to Defendants' Concise Statement of Facts on the ground that the statements are not properly supported by the record. If a party objects to a statement of fact offered by the opposing party, the court looks to the record to determine whether a genuine issue exists with regard to that fact. In other words, the court does not rely on the parties statement that a material fact is in dispute but looks to the record to determine first, if the fact is relevant, and second, if the fact is in dispute. The court has done so in this regard and Defendants' motion to strike a portion of Plaintiff's Response to Defendants' Concise Statement of Facts should be denied.

<u>Background</u>

Pacific operates kidney dialysis clinics throughout the Pacific Northwest, including a clinic at the Rose Quarter in Portland, Oregon (the "Clinic"). Plaintiff worked for Pacific at the Clinic as a dialysis technician from 2000 until she went on voluntary medical leave on March 26, 2004.

Plaintiff worked with Pacific's patients, starting them on the dialysis machines and monitoring them throughout the process. Early in her employment with Pacific, in either 2000 or 2001, Plaintiff was sexually harassed by a patient. She reported the harassment to a Clinic social worker but did not complain to her supervisor or Pacific's human resources department.

During her tenure at Pacific, Pacific encouraged its employees to fill out Quality Improvement Reports when they became aware of health and safety issues. The reports were reviewed by the facility manager and then forwarded to the medical director. However, Plaintiff regularly communicated, both orally and in writing, complaints regarding health issues to a number of co-workers, as well as her supervisors at Pacific. Plaintiff also complained to her supervisors

about her co-workers when they did not follow Pacific's procedures.

For the most part, Plaintiff's performance reviews were positive with few, if any, disciplinary problems until 2003. In May 2003, Plaintiff's co-workers made complaints about her through the compliance hotline. Shortly thereafter, Plaintiff requested a transfer to the Forest Grove facility, which was denied by the manager of the Forest Grove facility on the advise of Megan Loughney, Pacific's human resources manager, and Lori Fedje, Pacific's regional manager and director of operations. In September 2003, Plaintiff received a performance correction for smoking in an unauthorized area, leaving personal belongings in the patient care area and making personal phone calls. Plaintiff admits that she engaged in these activities but argues that the conduct did not violate Pacific's policies. Plaintiff met with her supervisor, James Glaccum, and Fedje to discuss work issues, including Plaintiff's dissatisfaction with Pacific's treatment of its workers and patients and her feeling that she was being targeted for termination.

The next month, Plaintiff's co-workers complained about her again. While the complaints were not well-founded, Loughney noted that Plaintiff had a pattern of making false allegations about and second-guessing her co-workers. These items were not discussed with Plaintiff at this time. The same month, Plaintiff and another co-worker were threatened by a patient. Plaintiff reported the threats and the Clinic management discussed the situation with the patient. Plaintiff did not report any additional altercations with the patient. However, she did experience symptoms of anxiety when she saw him at the Clinic.

In November 2003, Plaintiff was involved in an argument with and was threatened by a co-worker, Angela Uba. Plaintiff again experienced anxiety, including chest pains, shaking, and difficulty breathing and focusing. Uba was terminated after this incident.

Plaintiff was also involved in an incident involving Daniel Delgado, another co-worker. Plaintiff put one of Delgado's patients on a dialysis machine without discussing it with Delgado. As a result, Plaintiff threatened to leave the Clinic before a replacement arrived but was counseled to stay and wait. Glaccum spoke to Plaintiff about the incident and was later told to prepare a performance correction notice. Glaccum prepared the report but refused to issue it and was subsequently terminated by Pacific.

Stan Bower became the Clinic manager, and Plaintiff's supervisor, in January 2004. Bower found the performance correction notice prepared by Glaccum for the incident with Delgado in November 2003, discussed the incident with Plaintiff and placed the report in her file later that month. About this time, Plaintiff complained, on more than one occasion, about the inadequacy of the gowns provided to the dialysis technicians.[5]

In February, Plaintiff again requested a transfer to another facility. Bower and Loughney denied the transfer and explained to Plaintiff that Pacific's policy was not to transfer an employee within six months of a disciplinary action and that Plaintiff would not be eligible for a transfer until May 2004.

An inspector from Medicare visited the Clinic in March 2004 for a routine recertification inspection. The inspector interviewed a number of Pacific's employees, including Plaintiff. At that time, Plaintiff complained about the lack of appropriate protective equipment, shortness of staff and incompetency of some staff. Plaintiff had made all of these complaints to her supervisors and co-workers as well.

Plaintiff received two disciplinary write-ups in March 2004 from Bower. The first write-up,

---

[5]Pacific eventually changed the gowns used at the Clinic, in August 2004.

dated March 9, 2004, was based on Plaintiff's failure to try to improve her work situation. Specifically, Plaintiff complained when a charge nurse asked for help with a patient, asking why someone else couldn't handle it. Plaintiff ended up helping the patient but in such a gruff manner that the patient was concerned that she had done something to upset Plaintiff. On another occasion, Plaintiff was asked by a charge nurse to perform a test. Plaintiff replied "I am not going to do that, I don't care if I get written up for insubordination." Bower Depo., Exh. 4. Plaintiff eventually performed the requested task. Finally, Plaintiff objected to a staffing assignment and stated, "I am just going to call in sick, then."[6] Bower Depo. at 46-47.

On March 26, 2004, Bower issued a second disciplinary write-up, designated as a final written warning, stating that Plaintiff would be terminated if the behavior was repeated. The disciplinary write-up was based on Plaintiff's responding to a request for help with "I'm busy. Who's asking?" and Plaintiff's complaint that she hadn't even had time to go to the bathroom yet when asked to move the coat that she had draped over a garbage can. Bower Depo., Exh. 5; Pltf's. Depo. at 150. Also, Plaintiff ridiculed a co-worker during a staff meeting by telling him he should "put a dunce cap on and sit in the corner. That's a stupid question." Bower Depo., Exh. 5; Plf.'s. Demo. at 154

Plaintiff began her voluntary medical leave for work-related anxiety on March 26, 2006. Four days later, she filed a complaint with the Oregon Occupational Safety and Health Division ("OSHA") relating to the work conditions at the Clinic. After investigating the complaint, OSHA advised Pacific of a number of safety and/or health rule violations but did not issue a citation. Bower did not know that Plaintiff had filed the complaint.

---

[6]Plaintiff did call in sick for two days but reported that it was to care for a sick child.

Plaintiff was first diagnosed with panic disorder without agoraphobia in April 2004. As described by her physician, Diane Kaiser, PSAT, Plaintiffs symptoms included "periods of chest pain, heart palpitations, dizziness, an inability to concentrate, destructibility, disorientation, extreme worry and sleeping problems." Thistlethwaite Off., Exhibit NN. Plaintiff filed a workers' compensation claim almost immediately. She reported her on-the-job injury to Pacific on May 18, 2004.

On June 24, 2004, Plaintiff requested a change in her work status from full time to PRN (as needed) as of July 9, 2004. Then, on July 10, 2004, Plaintiff was released to return to work by Dr. Kaiser on a part-time basis (three days per week) and at the Good Samaritan or Oregon Health Science University locations. At this time, Plaintiff was capable of performing all of the essential functions of a dialysis technician, as well attending church, driving her car and leaving her home. Plaintiff had trouble sleeping and with her memory and concentration. She also had some difficulty answering her phone or picking up the mail due to her fear of the unknown. She avoided certain places, such as the area around the Clinic and a Safeway store that she use to frequent. She did not exercise, shop at Lloyd Center or visit her nephew as often as she used to.

Pacific denied Plaintiff's request for a transfer based on it's policy prohibiting an employee from transferring to a different facility within six months of a disciplinary action. However, Pacific offered Plaintiff her previous position at the Clinic and to discuss her previous disciplinary write-ups to allow her to succeed at that position. Dr. Kaiser indicated that Plaintiff's stress was not related to the job, but to the manager and the associates at the Clinic. As a result of her condition, Plaintiff was unable to work with Stan Bower or at the Clinic, but she would be able to work at any other location. Plaintiff was then again totally restricted from working from August 30 to October 31,

2004.  The physician noted that Plaintiff "needs accommodation – unable to work at Rose Quarter

Dialysis or under management of Rose Quarter Dialysis supervisor/manager." Thistlethwaite Off.,

Exhibit V.V.

In a letter dated October 20, 2004, Pacific again offered to return Plaintiff to work at the

Clinic in the same position as before she took her medical leave.  Dr. Kaiser explained in a letter

dated October 26, 2004, that:

> Given the symptoms of her disorder and its related triggers (including the parking
> lot, building site, supervisors), it would not be possible for Ms. Game-Morales to
> function effectively at her job at Rose Quarter.  Moreover, because of her strong
> emotional reactivity to any situations and/or people related to the Rose Quarter work
> site, I do not believe she will be able to appropriately handle conflict that is directly
> related to this area of concern.  In other words, she is very likely to react to any
> conflict dealing with the Rose Quarter work situation with extreme anxiety, panic
> and defensiveness.

Exhibit Z.

Plaintiff was released on October 29, 2004, to work three days a week for two weeks, four

days a week for a week, and then full time, at any facility other than the Clinic and under new

manager/supervisors.  Similarly, on November 29, 2004, Plaintiff was released to work "part-time

at another location under supervision by other than current manager" at anytime through January

29, 2005.[7] Thistlethwaite Off., Exhibit DDD and EYE.

In the spring of 2005, Plaintiff filed a complaint with the Equal Employment Opportunity

Commission ("EEC") alleging disability discrimination.  The EEC found no substantial evidence

of discrimination.

Pacific terminated Plaintiff in September 2005, when she failed to return to work after 18

---

[7]The release actually says 12/28/04 to 1/29/04 but the court assumes that the writer
intended 1/29/05.

months.  At that time, Plaintiff was employed by the Oregon Health Sciences University ("OHS")

and Freestones Medical Care Group.  Plaintiff was employed on a full-time basis by OHS in

November 2005. While on medical leave from Pacific, Plaintiff received a satisfactory performance

evaluation, an annual pay increase and a gift for Associate Appreciation Week.

<u>Legal Standard</u>

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary judgment:

> if the pleadings, depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).  "[The requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Antes</u>

<u>v. Transworld Systems, Inc.</u>, 765 F. Supp. 162, 165 (Del. 1991) (citing <u>Anderson v. Liberty Lobby,</u>

<u>Inc.</u>, 477 U.S. 242, 247-48 (1986))(emphasis in original).

The movant has the initial burden of establishing that no genuine issue of material fact exists

or that a material fact essential to the nonmovant's claim is absent. <u>Celotex v. Catrett</u>, 477 U.S. 317,

322-24 (1986).  Once the movant has met its burden, the onus is on the nonmovant to establish that

there is a genuine issue of material fact. <u>Id</u>. at 324.  In order to meet this burden, the nonmovant

"may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth

specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see <u>Celotex</u>, 477

U.S. at 324.

An issue of fact is material if, under the substantive law of the case, resolution of the factual

dispute could affect the outcome of the case. <u>Anderson</u>, 477 U.S. at 248.  Factual disputes are

genuine if they "properly can be resolved only by a finder of fact because they may reasonably be

resolved in favor of either party." <u>Id</u>. at 250.  On the other hand, if after the court has drawn all

reasonable inferences in favor of the nonmoving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).

Discussion

**First and Sixth Claims for Relief - Federal and State Disability Discrimination**

The American with Disabilities Act of 1990 (42 U.S.C. §12201)(the "ADA") prohibits covered employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a). The ADA defines "qualified individual with a disability" as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8); 29 C.F.R. §1630.2(m). In order to prevail on an employment termination claim under the ADA, a plaintiff must establish that: (1) she is a disabled person within the meaning of the ADA; (2) she is qualified, that is, with or without reasonable accommodation (which she must describe), she is able to perform the essential functions of the job; and (3) the employer terminated her because of her disability. Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1246 (9th Cir. 1999).

The standard for establishing a prima facie case under the Oregon disability statutes is the same as under the analogous ADA provision. See Wheeler v. Marathon Printing, Inc., 157 Or.App. 290, 301 n.6,(1998)(noting that the Oregon statutory scheme regarding workplace discrimination against disabled persons "contain[s] language significantly similar to the ADA"); Henderson v. Jantzen, Inc., 79 Or.App. 654, 656-657(1986); see also O.R.S. 659A.139 ("O.R.S. 659A.112 to 659A.139 shall be construed to the extent possible in a manner that is consistent with any similar

provisions of the federal Americans with Disabilities Act of 1990, as amended.").  Accordingly, unless otherwise noted, this court will interpret O.R.S.  659A.112 - 659A.139 consistent with the ADA.

Under 42 U.S.C. §12102(2), a person is considered disabled if she: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment.  See Sutton v. United Air Lines, Inc., 527 U.S. 471, 476-478 (1999); see also O.R.S. 659A.100(1).

"Major life activities" means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(I); see also O.R.S. § 659A.100(2)(a).  "Substantially limited" refers to the inability to perform a major life activity as compared to the average person in the general population or a significant restriction "as to the condition, manner or duration" under which an individual can perform the particular activity. 29 C.F.R. § 1630.2(j)(1)(i)-(ii); see also Thompson v. Holy Family Hosp., 121 F.3d 537, 539-540 (9th Cir. 1997).  Three factors are to be considered in determining whether an individual is substantially limited in a major life activity, the: (I) nature and severity of the impairment; (ii) duration or expected duration of the impairment; and (iii) permanent or long-term impact, or the expected permanent or long term impact of or resulting from the impairment.  29 C.F.R. §1630.2(j)(2).

Plaintiff suffers from panic disorder without agoraphobia.  She was diagnosed with the condition in April 2004.  By July 2004, Plaintiff was able to perform all of the requirements of her occupation as a dialysis technician as long as she did not work at the Clinic or under her previous manager.  She stated that she was limited to some degree in her ability to talk on the phone, pick up

the mail, drive, leave her home, exercise, shop, attend church, sleep and concentrate. However, she was able to do everything she did before her diagnosis. Plaintiff has not shown that she is substantially limited in a major life activity other than work.

For the purposes of the ADA, working is considered a "major life activity." Cartwright v. Lockheed Martin Utility Services, 40 Fed.Appx. 147, 154 (6th Cir. 2002). "To be substantially limited in the major life activity of working, * * * one must be precluded from more than one type of job, a specialized job, or a particular job of choice." Id. The regulations applicable to ADA provide that "the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. §1630.2(j)(3)(I).

In Cartwright, the Sixth Circuit held that if a plaintiff's only limitation is that he is unable to work under a particular supervisor, he is not a disabled person under the ADA. Id. See also Weiler v. Household Finance Corp., 101 F.3d 519, 524 (7th Cir. 1996)("The major life activity of working is not 'substantially limited' if a plaintiff merely cannot work under a certain supervisor because of anxiety and stress related to his review of her job performance.") This court finds it equally reasonable that, if an individual asserts that she is unable to work at a specific job site, she is merely limited from a particular job of choice at a particular location and, therefore, is not disabled under the ADA. Accordingly, Plaintiff's inability to work at the Clinic or for Bower does not render her substantially limited in the major life activity of working and she is not disabled under the ADA. Defendants are entitled to summary judgment on Plaintiff's disability claims.

**Second and Seventh Claims for Relief - Federal and State Family Leave Act Violations**

The Family Medical Leave Act (29 U.S.C. §2601, *et. seq*))("FMLA") and the Oregon Family Leave Act (O.R.S. 659A.150 et seq.)("OFLA") allow eligible employees to take twelve workweeks

of leave per year to care for their own or a family member's serious health condition.  29 U.S.C. §

2612(a)(1)(D); O.R.S. 659A.162(1).  Upon their return, the employee is entitled to be restored to

the position held prior to taking the leave. 29 U.S.C. §2614(a); O.R.S. 659A.171(1).  However, "if

an employee fails to return to work on or before the date that FMLA leave expires, the right to

reinstatement also expires. Hunt v. Rapides Healthcare System, LLC., 277 F.3d 757, 763 (5th Cir.

2002); Smith v. Guard Publishing, Inc., 155 Or. App. 481, 483 (citing 29 C.F.R. §825.214); The TJX

Companies, Inc., 19 BOLI 97 (Or. 1999).

Plaintiff began her medical leave on March 26, 2004.  The first date that she was released

to return to work was fifteen weeks later, on July 10, 2004, well over the twelve workweeks

authorized under the FMLA or OFLA.  Plaintiff lost her right to reinstatement under the FMLA or

OFLA.  Plaintiff argues that Defendants improperly label her leave from April 1, 2004, through July

10, 2004, and October 2004 through November 2005 as "medical leave" when it should be

characterized as a reasonable accommodation under the ADA for her occupational injury.  Plaintiff

has failed to point to any language in the FMLA or the OFLA which distinguishes the type of leave

covered in this manner and, even assuming that such a distinction did exist, Plaintiff would not

qualify for reinstatement under the FMLA or OFLA if she was not on medical leave covered by the

legislation.  Furthermore, from July 10, 1004, to August 30, 2004, Plaintiff had been released by her

physician to return to work and would not qualify for medical leave under any statute during this

time.

Plaintiff also asserts that Pacific discriminated against her for taking medical leave under the

FMLA and OFLA.  Plaintiff contends that Pacific's refusal to accommodate her request that she be

transferred to another facility and her eventual termination in September 2005, well over a year after

she went on medical leave, were retaliatory adverse employment actions.

To prove a claim for retaliatory actions under the FMLA and the OFLA, a plaintiff must show that they engaged in a act protected by the legislation, they suffered an adverse employment action, and the existence of a causal relationship between the conduct and the action. Bachelder v. America West Airlines, Inc., 259 F.3d 1112 (9th Cir. 2001); Yeager v. Providence Health System Oregon, 195 Or.App. 134 (2004). Defendants concede that Plaintiff has met the first element, but argues that she did not suffer any adverse employment claim.

A majority of the federal Circuit Courts, including the Ninth Circuit, take an expansive view of the type of actions that can be considered adverse employment actions in the context of Title VII. See, e.g., Ray v. Henderson, 217 F.3d 1234, 1241-1243 (9th Cir. 2000). In Ray, the Ninth Circuit held that an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity. The Ninth Circuit applied this same logic to define what conduct constitutes an adverse employment action for the purposes of the FMLA. Bachelder, 259 F.3d at 1124.

Among the employment actions that may constitute an adverse employment action under federal law depending on the circumstances are termination, dissemination of an unfavorable employment reference, issuance of an undeserved negative performance review, refusal to consider for promotion, exclusion from meetings, seminars and positions providing eligibility for salary increases, denial of secretarial support, a more burdensome work schedule, and a lateral transfer. Ray, 217 F.3d at 1241; Brooks v. City of San Mateo, 229 F.3d 917, 929 (9th Cir. 2000). Moreover, in Vasquez v. County of Los Angeles, 349 F.3d 634, 646 (9th Cir. 2004), the Ninth Circuit determined that the standard –- reasonably likely to deter employees from engaging in protected

activity -- was at least in part a subjective one as viewed by the charging party.

In light of the Ninth Circuit's opinion that a lateral transfer could be viewed as an adverse employment action, the court is not convinced that Pacific's refusal to transfer Plaintiff is not an adverse employment action. Pacific's termination of Plaintiff is clearly an adverse action. This being said, the court finds that there is no causal relationship between Plaintiff's protected activity and the adverse employment action.

Plaintiff requested the transfer to a new clinic in conjunction with her return from her medical leave. Pacific was under no obligation to accommodate Plaintiff's request as both the FMLA and the OFLA required Pacific to return Plaintiff to her former position, not a new one. Additionally, the evidence is clear that under Pacific's policy not to transfer an employee until they have had a six-month period without discipline, Plaintiff did not qualify for a transfer. Plaintiff's discipline occurred prior to her medical leave so it can not be viewed as the cause of her discipline. The decision to terminate Plaintiff was made eighteen months after Plaintiff invoked her right to medical leave and was based on the fact that Plaintiff had refused to return to work despite Pacific's numerous offers to return her to her old position. Plaintiff has failed to establish a prima facie case for violation of the FMLA or OFLA.

**Third and Fourth Claims for Relief - Federal and State Gender Discrimination[8]**

In her Third and Fourth Claims for Relief, Plaintiff alleges that Pacific discriminated against her based on her gender when it failed to adequately respond to her complaints about two male patients who had harassed or threatened her. Plaintiff characterizes this claim as a hostile

---

[8]Plaintiff alleges a claim for state race discrimination in her complaint. At oral argument, Plaintiff conceded this claim.

environment claim.

A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank FSB v. Vinson, 477 U.S. 57, 65- 67 (1986)). "Sexual or gender-based conduct which is abusive, humiliating, or threatening violates Title VII, . . . if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position" Steiner v. Showboat Operating Co., 25 F.3d 1459, 1463 (9th Cir. 1994).

The court must consider all the circumstances in determining whether a hostile environment existed. Harris, 510 U.S. at 23. Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. The Supreme Court explained, "[The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81-82 (1998)."[C]onduct must be extreme to result in a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). "[The required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991). Oregon's antidiscrimination statute, O.R.S. 659A.030, is patterned after Title VII, and federal law interpreting Title VII is instructive in evaluating claims under the state law. A.L.P., Inc. v. BOLI,

Page -23- FINDINGS AND RECOMMENDATION                    *{SIB}*

161 Or.App. 417, 422 (1999); see also Holien v. Sears, Roebuck and Co., 298 Or. 76, 88 (1984) (applying Title VII elements to state law claim).

To survive summary judgment, Plaintiff must show a disputed question of material fact regarding whether (1) a reasonable woman would find the workplace so objectively and subjectively hostile as to create an abusive working environment; and (2) Pacific failed to take adequate remedial and disciplinary action. Steiner, 25 F.3d at 1462-1463; see also Faragher, 524 U.S. at 787.

Plaintiff fails on both counts. She asserts that the sexual harassment by a patient in 2000 or 2001 and the abusive treatment by a patient in 2003 support her hostile environment claim. These circumstances are not severe or pervasive enough to give rise to a hostile work environment. The conduct Plaintiff complains was not "abusive, humiliating, or threatening" to the extent that it "pollut[ed her] workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position" Steiner, 25 F.3d at 1463. "The working environment must both subjectively and objectively be perceived as abusive." Fuller v. City of Oakland, 47 F.3d 1522, 1527 (9th Cir. 1995) (citing Harris, 510 U.S. at 21-22).

Also, Plaintiff has failed to establish that she reported the first instance of sexual harassment to her supervisors. She testified that she told the Clinic's social worker and no one else. With regard to the 2003 incident, the record shows that Pacific responded to Plaintiff's complaints, consulted with the patient and that the abusive treatment stopped after the first incident. Plaintiff has failed to meet her burden with regard to her gender discrimination claim.

Plaintiff also asserts a claim for retaliation under Title VII and Oregon law. To make out a *prima facie* case of retaliation under Title VII ("opposition clause" of 42 U.S.C. § 2000e-3(a)), an employee must establish that: (1) she engaged in protected activity, such as filing of a complaint

alleging racial discrimination; (2) the employer subjected her to adverse employment action; and (3) a casual link exists between the protected activity and the adverse action. <u>Manatt v. Bank of America, NA</u>, 339 F.3d 792, 798 (9th Cir. 2003).

Plaintiff claims that she was subject to disciplinary actions as a result of her gender discrimination complaints. Only the abusive treatment, which was reported to a supervisor, supports this claim as the sexual harassment was reported to a co-worker and was not within the knowledge of Plaintiff's supervisors or Pacific's management. After the report of the abusive treatment in October 2003, Plaintiff was the subject of three disciplinary actions. Plaintiff admits to engaging in the majority of the conduct covered in the reports and, based on this conduct, the disciplinary action was clearly justified. Additionally, all of the disciplinary reports were written by Bower, who was not working at the Clinic in October 2003, and therefore, not aware of Plaintiff's complaint of gender harassment at that time. Defendants are entitled to summary judgment on Plaintiff's retaliation claim under Title VII and state law as well.

The court also finds that Plaintiff's gender discrimination claims are barred by the statute of limitations. A discrimination charge under Title VII shall be filed within 300 days of the alleged unlawful employment practice in jurisdictions, such as Oregon, that have joint worksharing agreements between the EEC and an equivalent state agency. 42 U.S.C. §2000e-5(e). Under state law, a party must file a complaint with BOLI within one year of the unlawful practice. O.R.S. 659.040(1). The last offensive conduct occurred in October 2003. Plaintiff filed her complaint with BOLI in the spring of 2005, more than a year after the conduct.

**Fifth Claim for Relief - Workers' Compensation Retaliation**

Plaintiff asserts that Pacific retaliated against her for filing a workers' compensation claim.

"A *prima facie* case of retaliatory discharge under O.R.S. 659.410 is established by proving: (1) that the plaintiff invoked the workers' compensation system; (2) that the plaintiff was discriminated against in the tenure, terms or conditions of employment; and (3) that the employer discriminated against the plaintiff in the tenure or terms of employment because he or she invoked the workers' compensation system." Stanich v. Precision Body & Paint, Inc., 151 Or.App. 446, 457 (1997). "Invoke" for purposes of O.R.S. 659.410 includes a workers' report of an on-the-job injury. OAR 839-006-0105(2) (1998).

Plaintiff filed her workers' compensation claim in April 2004. The only adverse employment actions that occurred after this were the failure to transfer Plaintiff to a new facility and her ultimate termination. The court has determined that these actions were adverse to Plaintiff but that the actions were not causally related to Plaintiff's request for family medical leave benefits. The court finds that the same reasoning applies to Plaintiff's workers' compensation retaliation claim.

**Eighth Claim for Relief - Oregon Whistleblower Claim**

Plaintiff also claims that Pacific retaliated against her for making complaints about Pacific's business practices to her supervisors, Medicare, OSHA and the EEC.

O.R.S. 659A.230(1) provides:

> It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported criminal activity by any person, has in good faith caused a complainant's information or complaint to be filed against any person, has in good faith cooperated with any law enforcement agency conducting a criminal investigation, has in good faith brought a civil proceeding against an employer or has testified in good faith at a civil proceeding or criminal trial.

This court has previously held that the statute requires that the report be made to someone other than

the employer. <u>Ardueser v. Tektronix, Inc.</u>, CV No. 94-503-AS, F&R filed September 26, 1994, Adopted by Judge Redden, March 3, 1995. Therefore, Plaintiff may not rely on the complaints she made to her employer.

Plaintiff complained to both Medicare and OSHA in March 2004. It is unclear whether the complaint to Medicare was made before or after Plaintiff's two disciplinary reports in that month. Even assuming that the disciplinary reports were written after this complaint was made, there is no evidence that Bower, who authored the reports, was aware of Plaintiff's complaint to Medicare at the time he issued the reports. Accordingly, there is no evidence of a causal connection between the complaint and the reports.

The OSHA complaint was made anonymously by telephone on March 30, 2004, after Plaintiff started her medical leave. Again, there is no evidence that anyone at Pacific knew that Plaintiff had made the complaint and, therefore, no evidence that Pacific refused Plaintiff's request for a transfer and eventually terminated her because of her complaint to OSHA.

Finally, Plaintiff filed her EEOC/BOLI complaint in the spring of 2005. The only adverse action that occurred after this date was Plaintiff's termination in September 2005. Plaintiff was terminated for refusing to return to work for more than 17 months after she started her family medical leave. Pacific clearly had valid reasons for the termination and there is no evidence that the termination was based, in any way, on Plaintiff's BOLI filing.

Plaintiff has failed to provide sufficient evidence to support her claim for violation of the state Whistleblower statute. Summary judgment is appropriate.

**Ninth Claim for Relief - Defamation**

The court has stricken Plaintiff's statement that provides her only evidence of a defamation

claim.  Accordingly, Plaintiff's has failed to adequately support this claim and it should be dismissed.

Conclusion

Defendants' motion (#62) to strike should be GRANTED with regard to Paragraph 24, the first sentence of Paragraph 47, the embellishment of Plaintiff's limitations in Paragraphs 55-64, 66, 67 and 69, and Paragraphs 72-73 of Plaintiff's declaration and Plaintiff's Exhibits HHH attached to the Thistlethwaite affidavit, and DENIED in all other respects. Defendants' motion (#39) for summary judgment should be GRANTED.

Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due  **July 25, 2006**.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 5th day of July, 2006.

   /s/   Donald C. Ashmanskas
         DONALD C. ASHMANSKAS
         United States Magistrate Judge